UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RYAN ASH,**

        **Plaintiff,**

  v.                                                 Civil Action 2:24-cv-453
                                                                      Magistrate Judge Chelsey M. Vascura

**SERGEANT ROBERT PHILLIPS, III,**
*et al.*,

        **Defendants.**

## OPINION AND ORDER

Plaintiff, Ryan Ash, sues five Newark Police Department officers for violation of his rights under the Fourth and Fourteenth Amendments and Ohio common law arising from his arrest in his home. This matter is before the Court on Plaintiff's Motion to Extend the Case Schedule (ECF No. 32) and Defendants' Motion for Summary Judgment (ECF No. 28.) For the following reasons, Plaintiff's Motion is **DENIED**, and Defendants' Motion is **GRANTED IN PART and DENIED WITHOUT PREJUDICE IN PART**.

                I.        BACKGROUND

The facts are not in dispute and are captured almost entirely by the body-worn camera footage of Defendant Dustin Hardway. ("Hardway BWC," ECF No. 27.)

In the early morning of July 22, 2023, Newark police were dispatched to the residence of Plaintiff Ryan Ash at 46 Arbor Court, Newark, Ohio. Mr. Ash called 911 when non-party Teresa Bordeaux broke a window and then continued seeking entrance to the residence over Mr. Ash's objection. All five Defendants (Sergeant Robert Phillips, III, Officer Dustin Hardway, Officer

Kevin Fairfield, Officer Kevin Distelhorst, and Officer Matthew Peddicord) responded on behalf of the Newark Police Department. Defendant Hardway was the first to arrive on the scene and encountered a woman outside the residence, later identified as Teresa Bordeax. As Ms. Bordeux gestures toward the residence, she can be heard finishing a sentence: "won't let me in my house, I've been out here freezing…" (Hardway BWC at 5:59:02–08.) She later states, "he has not let me in for hours. I'm frozen." (*Id.* at 6:01:39–43.) Officer Hardway calls out, "does she live here?" Ms. Bordeaux immediately responds, "yes, I do." (*Id.* at 5:59:38–6:00:34.) Mr. Ash denies that Ms. Bordeaux lives at the residence. Ms. Bordeaux states "I have mail delivered here for the past year . . . I've lived here for two years . . . ." (*Id.* at 6:00:35–45.) She also states that the lease to residence in is in the names of both Ms. Bordeaux and Mr. Ash. (*Id.* at 06:13:20-06:13:28). Ms. Bordeaux states that "I have to get in. This is where I sleep, where I sleep at night," and "he has my purse; I don't have anything on me." (*Id.* at 06:15:35-06:15:15; 6:00:45–6:01:04.) Ms. Bordeaux states that her key to the residence is in her purse, which Mr. Ash is holding inside the house. (*Id.* at 06:10:20–06:10:42.) She also attempts to enter the residence using a key code for the attached garage, but finds the code pad lacking a functioning battery. (*Id.* at 06:11:07-06:11:58.)

During the time the officers are speaking with Ms. Bordeaux, Officer Hardway offers to let Ms. Bordeaux wait in his police vehicle, and she accepts. (*Id.* at 6:05:38–58.) The vehicle remains open for her to wait in throughout the rest of the incident. She also has her phone in her possession and calls her sister, who stays on the line with her for much of the incident. (*Id.* at 6:13:18.)

Ms. Bordeaux provides her social security number and birthdate; Officer Hardway transmits the information to dispatch, who confirms Ms. Bordeaux's identity. (*Id.* at 06:01:16–

2

06:03:18.) Officer Hardway later runs Ms. Bordeaux through the Law Enforcement Automated Data System ("LEADS"), which shows her address as 46 Arbor Court, Newark, Ohio. (*Id*. at 06:18:54–06:19:49.)

Ms. Bordeaux states that Mr. Ash physically assaulted her, gesturing to her arm where she was apparently scratched and bruised. (*Id*. at 06:10:35–06:11:03.)[1] She states that "we got into a physical altercation as soon as I walked in" and that "he literally forcibly pushed me out of the house." (*Id*. at 06:20:55–59, 6:10:30–34.) When the Sergeant Phillips asks if she wants to press charges against Mr. Ash for assault, she responds, "I definitely do." (*Id*. at 06:21:47–06:22:01.) Sergeant Phillips asks Ms. Bordeaux, "are you okay with us going inside?" and Ms. Bordeaux states, "you guys can go inside all you want." (*Id*. at 06:21:00–26).

The officers approach the residence and knock on the door. When they receive no response, they call out to Mr. Ash, demanding that he open the door or else the officers would break it down. (*Id*. at 06:22:21–6:28:18.) They repeat this warning several times and eventually begin using a battering ram to attempt to break down the door. (*Id*. at 6:28:18.) The officers continue using the battering ram unsuccessfully for about thirty seconds, at which point Ms. Bordeaux asks, "Can we—can we just…can we not? Can we not? Can we not? Can we not?" (*Id*. at 6:28:52–58.) One of the officers responds, "Ma'am, ma'am, you have asked—you've—" to which Ms. Bordeaux replies "I know." (*Id*. at 6:28:59–6:29:03.) The officers then immediately break the window next to the door and reach inside to turn the deadbolt. (*Id*. at 6:29:04–21.) After kicking the door several times to dislodge an object that had been placed against the inside

---

[1] The Court could discern no visible scratches or bruises from Officer Hardway's body worn camera footage.

of the door, the officers open the door, enter the residence, and arrest Mr. Ash for assault. (*Id.* at 6:29:22–6:30:11.)

Mr. Ash was ultimately charged with assault, domestic violence, and obstruction of justice. He was jailed from July 22, 2023, until July 24, 2023, while awaiting his arraignment. All charges were dismissed on October 18, 2023, one day before trial was set to begin. (Compl. ¶¶ 16–19, ECF No. 1.) After the charges were dismissed, Mr. Ash submitted an internal administrative complaint with the City of Newark Police Department regarding Defendants' actions. In response, Sergeant Phillips arrived at Mr. Ash's residence and repeatedly banged on the door to his home at 7 in the morning. Phillips left a note on Mr. Ash's door stating he was "[f]ollowing up on a complain[t] filed." No other actions were taken by the City of Newark or its Police Department in response to Mr. Ash's complaint. (*Id.* at ¶¶ 23–26.)

Mr. Ash's Complaint names each of the five Defendant officers in both their individual and official capacities and advances six counts:

(1) Violation of Fourth Amendment Rights under 42 U.S.C. § 1983 against the individual Defendants and the City of Newark, for entering Mr. Ash's home and arresting him without a warrant or probable cause;[2]

(2) Violation of Fourth and Fourteenth Amendment Rights under 42 U.S.C. § 1983 for malicious prosecution;

(3) Malicious prosecution under Ohio common law;

(4) False arrest under Ohio common law;

(5) Gross negligence under Ohio common law; and

(6) Invasion of privacy under Ohio common law.

---

[2] Mr. Ash's Complaint captions Count 1 as being brought under both the Fourth and Fourteenth Amendment; however, the supporting allegations for Count 1 refer only to the Fourth Amendment, and not to the Fourteenth Amendment (nor to due process or equal protection). The Court therefore construes Count 1 to be brought under only the Fourth Amendment, despite its caption.

On March 4, 2025, Defendants filed the subject motion for summary judgment on all claims. (ECF No. 28.)

## II. STANDARD FOR SUMMARY JUDGMENT MOTIONS

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the court may "consider the fact undisputed for purposes of the motion").

The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255 (citation omitted). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

### III.     ANALYSIS

As an initial matter, Mr. Ash's memorandum in opposition to Defendants' Motion for Summary Judgment includes a request to extend the discovery period. (Mem. in Opp'n, ECF No. 32.) Mr. Ash's motion to extend the discovery period is **DENIED**.

A district court must enter a scheduling order limiting the time "to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(3)(A). When, as here, a party misses a scheduling order's deadlines and seeks a modification of those deadlines, the party must first demonstrate good cause. *See* Fed. R. Civ. P. 16(b)(4); *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005). "The primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quotation omitted); *accord Leary v. Daeschner,* 349 F.3d 888, 906 (6th Cir. 2003) ("[A] court choosing to modify the schedule upon a showing of good cause, may do so only if it cannot reasonably be met despite the diligence of the party seeking the extension." (quotation omitted)). "Another important consideration . . . is whether the opposing party will suffer prejudice by virtue of the amendment." *Leary*, 349 F.3d at 906 (citing *Inge*, 281 F.3d at 625).

Mr. Ash has not demonstrated good cause to extend the discovery period. When the Court granted Mr. Ash's attorney's motion to withdraw as counsel on November 13, 2024, the Court noted that "Mr. McCoy has provided Plaintiff with advance notice of his intent to withdraw and provided a list of upcoming deadlines for the case. Plaintiff is also free to retain new counsel or to request extensions of any pending deadlines." (ECF No. 18.) Yet Mr. Ash failed to request an extension of the discovery period until responding to Defendants' Motion for Summary Judgment on April 8, 2025—more than two months after the discovery deadline. This delay reflects a lack of diligence. Further, because Defendants had already briefed their Motion

for Summary Judgment by the time of Mr. Ash's request, they would undoubtedly be prejudiced if the case schedule were extended at this time. *See, e.g.*, *Leary*, 349 F.3d at 892 ("Defendant would suffer prejudice by allowing this amendment which would require the reopening of discovery at this late stage of the proceedings."); *Sterling Jewelers Inc. v. Alex & Ani, LLC*, No. 5:17-CV-2540, 2019 WL 95842, at *3 (N.D. Ohio Jan. 3, 2019) ("Given that the periods for non-expert and expert discovery have expired, and the January 15, 2019 dispositive motion deadline is fast approaching, any extension of the discovery periods would have the cascading effect of jeopardizing the Court's remaining dates and deadlines.").

Because Mr. Ash has demonstrated neither diligence nor lack of prejudice to Defendants in seeking to extend the discovery period, his motion is **DENIED**, and the Court proceeds to consider the parties' summary judgment arguments.

A.  **Defendants are entitled to qualified immunity on Mr. Ash's Fourth Amendment entry claim.**

The Court finds that although Defendants arguably violated Mr. Ash's Fourth Amendment rights by entering his residence without a warrant and over his objection, any such violation was not clearly established and therefore Defendants are entitled to qualified immunity on Mr. Ash's Fourth Amendment entry claim.

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531,

7

538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (cleaned up). The determination of whether a government official is entitled to qualified immunity involves two inquiries. *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010). "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id*. (cleaned up). The Court need not consider these inquiries sequentially. *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (citing *Pearson*, 555 U.S. at 236).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "That standard generally requires the obtaining of a judicial warrant before a law enforcement officer can enter a home without permission." *Lange v. California*, 594 U.S. 295, 301 (2021) (cleaned up). This warrant requirement, however, is subject to various exceptions, including the consent of an individual reasonably appearing to possess authority to consent. *See*, *e.g.*, *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Defendants argue that Ms. Bordeaux consented to their entry, and that because she possessed authority to do so as a co-tenant of the residence, their entry did not violate the Fourth Amendment.

There are two problems with this argument. First, Ms. Bordeaux apparently thought better of her authorization for the police to enter the residence when she shouted, "can we not?" four times at the officers after they had begun attempting to break down the door. The moment she changed her mind, her consent was no longer valid to authorize the officers' entry. *See Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999) ("Although a premises search conducted

8

pursuant to valid consent cannot violate the Fourth Amendment, the consenting party may limit the scope of that search, and hence at any moment may retract his consent.") (citation omitted). Thus, even though the officers may have lawfully begun their attempts to enter the residence with Ms. Bordeaux's permission, those attempts at entry "should have terminated instantly upon [Ms. Bordeaux's] revocation of consent, and the officers should have promptly departed the premises (assuming they possessed no independent legal authority to remain)." *Id.* Instead, the officers' response to Ms. Bordeaux's request for them to stop ("Ma'am, ma'am, you have asked—") was to (1) incorrectly imply that she could not retract her consent because she had already asked the officers to arrest Mr. Ash for assault, and (2) immediately breach the door. Thus, Defendants exceeded the scope of Ms. Bordeaux's consent and any entry relying solely on her consent would be unlawful.

Second, even if Ms. Bordeaux had not withdrawn her consent, the United States Supreme Court in *Georgia v. Randolph* set forth the general rule that the consent of one co-tenant does *not* override the objection of a present and non-consenting co-tenant to the police's entry. 547 U.S. 103, 122–23 (2006) ("[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."). There is no question that Mr. Ash was present and expressly refused to allow the police to enter when he ignored their repeated requests to open the door. Thus, under no circumstances would Ms. Bordeaux's consent alone have allowed the police to enter the residence.

Defendants make yet another argument that their entry was lawful, relying on another section of the *Randolph* opinion. In dicta, the *Randolph* majority responded to the dissents' arguments that the majority's holding would leave domestic violence victims unprotected in the likely event that their abusers refused entry to the police. The *Randolph* majority disclaimed any

9

such danger, as "this case has no bearing on the capacity of the police to protect domestic victims." 547 U.S. at 118. The majority explained that police would still be permitted to enter over the objection of a co-tenant if necessary to ensure another co-tenant's safety:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause, see *Texas v. Brown,* 460 U.S. 730, 737–739, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion).) Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes. See 4 LaFave § 8.3(d), at 161 ("[E]ven when . . . two persons quite clearly have equal rights in the place, as where two individuals are sharing an apartment on an equal basis, there may nonetheless sometimes exist a basis for giving greater recognition to the interests of one over the other . . . . [W]here the defendant has victimized the third-party . . . the emergency nature of the situation is such that the third-party consent should validate a warrantless search despite defendant's objections" (internal quotation marks omitted; third omission in original)). The undoubted right of the police to enter in order to protect a victim, however, has nothing to do with the question in this case, whether a search with the consent of one co-tenant is good against another, standing at the door and expressly refusing consent.

*Id.* at 118–19.

Defendants contend that this discussion in *Randolph* legitimizes their entry into the Arbor Court residence because Ms. Bordeaux complained that she had been physically injured by Mr. Ash, with whom she lived—*i.e.*, she was a victim of domestic violence—and that her purse and keys were being kept from her inside the house by her abuser. But it is not at all clear that *Randolph* authorizes police entry for the sole purpose of permitting a domestic violence victim, who is otherwise safely away from her abuser and not in danger of any imminent harm, to merely collect belongings. Rather, the throughline of the *Randolph* dicta is the importance of ensuring the victim's physical safety. *See id.* at 118 (citing a treatise relying on "the emergency

10

nature of the situation" to permit police entry). It appears that the *Randolph* majority was merely referencing that other well-established exception to the Fourth Amendment's warrant requirement: exigent circumstances. *See, e.g.*, *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) ("We have also held that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.") (cleaned up); *see also Tobias v. Pletzke*, 933 F. Supp. 2d 892, 911–12 (E.D. Mich. 2013) ("*Randolph* does not establish a new categorical rule that police may always ignore the refusal to enter if made by a suspected physical abuser") (cleaned up); rather, "the necessary predicate—the exigency—is 'good reason to believe . . . a threat exists'") (quoting *Randolph* at 118)); *United States v. Tatman*, 615 F. Supp. 2d 664, 679 (S.D. Ohio 2008), *aff'd*, 397 F. App'x 152 (6th Cir. 2010) (rejecting application of any *Randolph* "domestic violence exception" because "[i]n this case, Taresa Tatman, the alleged victim, was in no immediate danger. In fact, she was safely outside the house with two police officers. Under these circumstances, no exigent circumstances exist and a warrantless entry is simply not justified.")

Even *Randolph*'s express reference to collecting belongings is coupled with an endorsement of police involvement to allow the victim to "get out safely," which was not a concern for Ms. Bordeaux at the time the Defendants arrived on the scene. By the time of Defendants' entry in the house, Ms. Bordeaux had been outside the residence for hours with no attempts by Mr. Ash to engage with her physically outside the house. It does not appear from the body worn camera footage that she was suffering from any significant injuries. She was seated safely in a police vehicle and was speaking on her phone (which remained in her possession throughout the incident) intermittently with her sister. The Court is not convinced that Ms.

Bordeaux's need to collect her purse and keys constituted exigent circumstances that would justify police entry without a warrant or the consent of all present co-tenants under the *Randolph* dicta.

But the Court need not ultimately decide whether the police violated Mr. Ash's Fourth Amendment rights by entering his residence, because the *Randolph* dicta is not so definitively worded as to make any such violation "clearly established" for the purposes of the qualified immunity analysis. Although the Court has its doubts that collection of a domestic violence victim's belongings alone justifies an otherwise unauthorized police entry, the *Randolph* dicta at least suggest this as a possibility. *See Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999) ("To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.") (cleaned up); *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (a clearly established violation may be demonstrated by "caselaw with a fact pattern similar enough to have given fair and clear warning to officers about what the law requires") (cleaned up). Here, even if a constitutional violation occurred, the Court concludes that it the violation was not clearly established. As a result, Defendants are entitled to qualified immunity on Mr. Ash's Fourth Amendment entry claim.

**B.      Defendants are entitled to qualified immunity on Mr. Ash's Fourth Amendment arrest claim.**

Although *Randolph* is not crystal clear on what circumstances justify entering a residence to protect domestic violence victims, *Randolph* expressly states that, assuming police have lawfully entered, "there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause." 547 U.S. at 118. Thus, assuming Defendants lawfully entered the Arbor Court residence, they could also lawfully arrest Mr. Ash if they had probable cause to do so.

12

Mr. Ash asserts that his arrest was *not* supported by probable cause. He contends that Defendants' factual summary omits that the police were in fact called to the Arbor Court residence twice on the morning of July 22, 2023. The call resulting in Mr. Ash's arrest was the second call. Newark police (including two of the Defendants) responded to the residence earlier in the night at Ms. Bordeaux's request, but she did not on that first occasion tell the officers that Mr. Ash had assaulted her. The officers concluded at that time that it was merely a civil matter that police could not assist with. It was only after Mr. Ash became verbally combative with the officers during the second visit that they decided to treat it as a domestic violence case. Mr. Ash also told the officers at the time that Ms. Bordeaux was on probation from a felony conviction in Florida, weakening her claim that she lived at the residence in Ohio. Mr. Ash also contends that Ms. Bordeaux was brought to the residence that morning by Heath police following a separate physical altercation with another individual and that her scratches and bruises therefore did not constitute probable cause to arrest Mr. Ash for assault.

None of these additional facts changes the Fourth Amendment or qualified immunity calculus. First, Mr. Ash has not submitted an affidavit or declaration or identified other parts of the record that support his additional factual contentions, such that they are not properly considered in opposition to summary judgment. *See* Fed. R. Civ. P. 56(c) (requiring a party to support its factual contentions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"); *Celotex*, 477 U.S. at 324 (Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and

13

admissions on file, designate specific facts showing that there is a genuine issue for trial.") (cleaned up).

But even if the Court were to consider these unsupported factual contentions, the outcome would be the same. The officers' probable cause determination was necessarily based on "acts and circumstances *within an officer's knowledge at the time of an arrest.*" *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (emphasis in original). Thus, it makes sense that Defendants did not pursue assault charges during their first visit when Ms. Bordeaux had not yet informed them of the alleged assault. And Ms. Bordeaux's felony probation in Florida did not require the officers to overlook the LEADS records indicating Ms. Bordeaux lived at the Arbor Court residence.

Indeed, Ms. Bordeaux's "confession that [Mr. Ash] had abused her alone is sufficient to establish probable cause" for domestic violence and assault charges. *See Thacker v. City of Columbus*, 328 F.3d 244, 257 (6th Cir. 2003). Given Ms. Bordeaux's statements to Defendants that "we got into a physical altercation as soon as I walked in" and that "he literally forcibly pushed me out of the house," and given Ms. Bordeaux's scratches and bruises that were visible to the officers, Defendants had probable cause to arrest Mr. Ash for domestic violence and assault. Thus, because Defendants were not clearly on notice that their entry was unlawful, and because the subsequent arrest was supported by probable cause, Defendants are entitled to qualified immunity on Mr. Ash's Fourth Amendment arrest claim.

## C. Defendants are entitled to summary judgment on Mr. Ash's federal malicious prosecution claim.

To succeed on a malicious-prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment, the plaintiff must prove (1) "that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the

decision to prosecute"; (2) "that there was a lack of probable cause for the criminal prosecution"; (3) "that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure"; and (4) "the criminal proceeding must have been resolved in the plaintiff's favor." *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010) (cleaned up).

Defendants contend that Mr. Ash cannot satisfy the third element, deprivation of liberty apart from the initial seizure, because he was detained only through his arraignment. The Court agrees. *See Wright v. City of Euclid*, 962 F.3d 852, 876–77 (6th Cir. 2020) (holding a deprivation might have occurred when the individual was detained in jail for hours after posting bond); *Miller v. Maddox*, 866 F.3d 386, 393 (6th Cir. 2017) (deprivation possibly occurred when defendant entered pretrial release program, had to pay fines, and was required to meet with case manager weekly); *Noonan v. County of Oakland*, 683 F. App'x 455, 463 (6th Cir. 2017) (summons to attend court is not a deprivation); *Cummin v. North*, 731 F. App'x 465, 470–73 (6th Cir. 2018) (no deprivation when defendant had to post bond, attend court five times, and maintain his current address, but faced no subsequent arrests or incarceration).

Moreover, Mr. Ash has offered no Rule 56 evidence to rebut Defendants' assertions that he was detained following the initial arrest. *See Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (when moving party has demonstrated the absence of evidence to support the non-moving party's case, non-moving party may not rest on its allegations to defeat summary judgment). Because Defendants have demonstrated the absence of evidence to support Mr. Ash's Fourth Amendment malicious prosecution claim, Defendants are entitled to summary judgment on this claim.

To the extent Mr. Ash also alleges that his prosecution violated the due process clause of the Fourteenth Amendment, that claim also fails. Supreme Court precedent holds that malicious prosecution cannot be pursued under the substantive due process clause of the Fourteenth Amendment. *Albright v. Oliver*, 510 U.S. 266 (1994). And to the extent Mr. Ash relies on the procedural due process clause, such a claim would be barred by the availability of state-law tort remedies under *Parratt v. Taylor*, 451 U.S. 527, 535–44 (1981). *See Albright*, 510 U.S. at 285 (Kennedy, J., concurring). Indeed, Mr. Ash has separately asserted a state-law malicious prosecution claim in Count 3. Mr. Ash may not, therefore, pursue a malicious prosecution claim based on the procedural due process clause of the Fourteenth Amendment under § 1983.

**D.    Defendants are entitled to summary judgment on Mr. Ash's *Monell* claim.**

Mr. Ash asserts that the City of Newark[3] is liable for Defendants' Fourth Amendment violations under the doctrine of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Nichols v. Wayne Cty. Mich.*, 822 F. App'x 445, 448 (6th Cir. 2020) ("To state a municipal-liability claim under § 1983, the plaintiff must allege the deprivation (1) of a right secured by the Constitution or laws of the United States, (2) that was directly caused by a municipal policy or custom.") (citing *Hardrick v. City of Detroit,* 876 F.3d 238, 243 (6th Cir. 2017)). A plaintiff may prove an unconstitutional "policy" or "custom" by demonstrating "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with

---

[3] Although Mr. Ash did not name the City of Newark as a Defendant, his Complaint sues the five Defendant officers in both their individual and official capacities. Mr. Ash's official-capacity claims are, in essence, claims against the municipality employing the Defendants. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

16

final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir. 2005)).

Because the Court has determined there was no constitutional violation in regard to Mr. Ash's malicious prosecution claim, there cannot have been any constitutional violation as a result of the City of Newark's customs or policies. But the Court has not determined that there was no constitutional violation as to the entry into Mr. Ash's home or his arrest. Instead, judgment for Defendants on those claims relies on qualified immunity. But qualified immunity is not an available defense to a suit against a municipality or a suit against municipal officials in their official capacity. *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 484 (6th Cir. 2014). Thus, although the Defendants are entitled to qualified immunity on Mr. Ash's individual-capacity Fourth Amendment entry and arrest claims, the City of Newark may nonetheless be liable if Mr. Ash is able to establish that Defendants violated his constitutional rights as a result of a policy or custom of the City of Newark.

But, as Defendants point out, Mr. Ash established no such policy or custom. Although the Complaint alleges that the City failed to act or acknowledge its employees' wrongdoing after Mr. Ash complained, thus ratifying Defendants' unconstitutional acts, Mr. Ash does not allege that any official with final decision making authority made that ratification. Nor has he made any factual contentions underlying his conclusory Complaint allegation that the City failed to train its officers. Nor, in any case, has Mr. Ash submitted any evidence that the Court may consider under Federal Rule of Civil Procedure 56 to rebut Defendants' arguments on summary judgment.

17

*See Moldowan*, 578 F.3d at 374. Defendants are therefore entitled to summary judgment on Mr. Ash's *Monell* claims.

E. **Because the Defendants are entitled to judgment on all of Mr. Ash's federal claims, the state-law claims are dismissed without prejudice under 28 U.S.C. § 1367.**

Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction when the Court "has dismissed all claims over which it has original jurisdiction." The United States Court of Appeals for the Sixth Circuit has held that "[i]f the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (citations omitted). Here, the Court has found for Defendants on all of Mr. Ash's federal claims and the Court lacks original jurisdiction over Mr. Ash's remaining state-law claims for malicious prosecution, false arrest, gross negligence, and invasion of privacy. Accordingly, dismissal of Mr. Ash's remaining claims without prejudice to re-filing in state court is appropriate. *See Thacker*, 328 F.3d at 260 (although district court considered malicious prosecution and false arrest claims under Ohio law after granting summary judgment to defendants on related federal claims, "it would have been appropriate to refuse to exercise pendent jurisdiction and to dismiss these claims without prejudice to being re-filed in the courts of the State of Ohio").

## IV. DISPOSITION

For the reasons above, Plaintiff's Motion to Extend the Discovery Period (ECF No. 32) is **DENIED**. Defendants' Motion for Summary Judgment is **GRANTED IN PART and DENIED WITHOUT PREJUDICE IN PART**. The Clerk is **DIRECTED** to enter judgment in favor of Defendants on Counts 1 and 2 of Plaintiff's Complaint. Counts 3–6 of Plaintiff's Complaint are **DISMISSED WITHOUT PREJUDICE** to re-filing in state court, where Defendants may

renew their summary judgment arguments as to those counts. The Clerk is **DIRECTED** to close this case.

    **IT IS SO ORDERED.**

<u>/s/ <i>Chelsey M. Vascura</i></u><br>
CHELSEY M. VASCURA<br>
UNITED STATES MAGISTRATE JUDGE